[Cite as *B.E.R. v. Columbus City School Dist.*, 2025-Ohio-582.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| [B.E.R., as administrator of the estate of E.R.-R.], | : | |
| | : | |
| Plaintiff-Appellant, | : | No. 23AP-776 |
| | : | (C.P.C. No. 21CV-5956) |
| v. | | |
| | : | (REGULAR CALENDAR) |
| Columbus City School District by and through the Columbus Board of Education et al., | : | |
| | : | |
| Defendants-Appellees. | : | |
| | : | |

D E C I S I O N

Rendered on February 20, 2025

**On brief:** *Walton + Brown, LLP*, and *Chanda L. Brown*, for appellant. **Argued:** *Chanda L. Brown*.

**On brief:** *Amundsen Davis, LLC*, and *John C. Albert*, for appellee Columbus City School District by and through the Columbus Board of Education. **Argued:** *John C. Albert*.

**On brief:** *Roetzel & Andress, LPA*, and *Bradley L. Snyder*, for appellee Lisa J. Wolf. **Argued:** *Bradley L. Snyder*.

APPEAL from the Franklin County Court of Common Pleas

DORRIAN, J.

{¶ 1} Plaintiff-appellant, B.E.R., as administrator of the estate of E.R.-R., a minor, appeals from a judgment entered by the Franklin County Court of Common Pleas granting the motions for summary judgment filed by defendants-appellees, Columbus City School District by and through the Columbus Board of Education ("CCS"), and Lisa J. Wolf. For the following reasons, we affirm in part, reverse in part, and remand for further proceedings.

## I.  Facts and Procedural History

{¶ 2}   On September 17, 2021, appellant filed a wrongful death action against CCS and Wolf stemming from the death of her 11-year-old daughter, E.R.-R., in a motor vehicle accident on September 18, 2019.  According to the allegations in the complaint, E.R.-R., a CCS middle school student, was walking from her home to her school bus stop at approximately 6:30 a.m. on September 18, 2019.  To reach the school bus stop, E.R.-R. was required to cross McNaughten Road ("McNaughten"), a high-traffic roadway with no sidewalks or crosswalks.   As E.R.-R. attempted to cross McNaughten, she was struck by a vehicle operated by Wolf; she was thereafter struck by a second vehicle.   The unidentified driver of the second vehicle fled the scene.   E.R.-R. died as result of the injuries sustained in the accident.

{¶ 3}   Appellant asserted two claims against CCS and "John Doe Bus Operator": (1) negligent operation of a motor vehicle under R.C. 2744.02(B)(1) (Count 1, Compl. at ¶ 18-27), and (2) reckless actions under R.C. 2744.03(A)(6)(b). Related to her R.C. 2744.02(B)(1) claim, appellant alleged that CCS was required to comply with Ohio Adm.Code 3301-83-13 in ensuring that, for the safety of students, school bus stops are established in safe locations, which includes establishing school bus stops on the residential side of roadways posing potential hazards to students.  Appellant alleged that because E.R.-R. was crossing the street to board the school bus at the time she was struck, the accident occurred during the "operation" of the school bus.  (Compl. at ¶ 19.)  Appellant alleged that CCS breached the duty of care owed E.R.-R. in operating the bus in a negligent manner, including "instructing [E.R.-R.] to load the bus in a dangerous location in violation of [Ohio Adm.Code 3301-83-13]."   (Compl. at ¶ 23.)   As to her R.C. 2744.03(A)(6)(b) claim, appellant alleged that CCS "chose to continue to keep [E.R.-R.'s] bus stop in a dangerous location despite the location being a dangerous hazard for not only children, but adult pedestrians as well.  The decision to not change the bus stop location or provide a traffic control officer was a wanton/reckless decision." (Compl. at ¶ 29.)  Appellant also asserted a claim for negligent operation of a motor vehicle against Wolf.[1]

---

[1] In addition, appellant asserted claims for "General Negligence" against TranSystems Corporation, MurphyEpson and "John Doe Transportation Company,"  and "John Doe Tortfeasors 1-5." (Counts 4-5, Compl. at ¶ 35-39.) Pursuant to Civ.R. 41(A)(1)(a), appellant voluntarily dismissed the claims against TranSystems Corporation and MurphyEpson without prejudice. (Feb. 8, 2023 Notice of Partial Voluntary Dismissal With Prejudice.) The "John Doe Tortfeasors" were never identified.

{¶ 4}  CCS and Wolf filed separate motions for summary judgment on June 15, 2023.  Appellant separately responded to the summary judgment motions on June 25, 2023.  CCS and Wolf filed replies to appellant's responses on August 1 and 8, 2023, respectively. In a decision and entry filed December 1, 2023, the trial court granted the motions for summary judgment filed by CCS and Wolf.

## II.  Assignments of Error

{¶ 5}  In a timely appeal, appellant sets forth the following two assignments of error for our review:

> [I.] The trial court erred when it granted the motion for summary judgment filed by Lisa Wolf.
>
> [II.] The trial court erred when it granted the motion for summary judgment filed by [Columbus City School District].

## III.  Discussion

{¶ 6}  Because both of appellant's assignments of error challenge the trial court's grant of summary judgment, we first set forth the standard of review applicable to those dispositions.

{¶ 7}  This court reviews a decision on a motion for summary judgment under a de novo standard of review.  *LRC Realty, Inc. v. B.E.B. Properties*, 160 Ohio St.3d 218, 2020-Ohio-3196, ¶ 11.  De novo appellate review means the court of appeals conducts an independent review, without deference to the trial court's decision.  *Wiltshire Capital Partners v. Reflections II, Inc.*, 10th Dist. No. 19AP-415, 2020-Ohio-3468, ¶ 12.  Summary judgment is appropriate only when the moving party demonstrates: (1) no genuine issue of material fact exists, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds could come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made.  Civ.R. 56(C); *State ex rel. Grady v. State Emp. Relations Bd.*, 78 Ohio St.3d 181, 183 (1997).  In ruling on a motion for summary judgment, the court must resolve all doubts and construe the evidence in favor of the non-moving party.  *Premiere Radio Networks, Inc. v. Sandblast, L.P.*, 10th Dist. No. 18AP-736, 2019-Ohio-4015, ¶ 6.

{¶ 8}  Pursuant to Civ.R. 56(C), the party moving for summary judgment bears the initial burden of informing the trial court of the basis for the motion and of identifying those

portions of the record demonstrating the absence of a genuine issue of material fact. *Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996). The moving party cannot satisfy the initial burden by simply making conclusory allegations, but instead must demonstrate, including by use of affidavit or other evidence allowed by Civ.R. 56(C), that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Wiltshire Capital* at ¶ 13. If the moving party satisfies the initial burden, the non-moving party has a burden to respond, by affidavit or otherwise as provided under Civ.R. 56, with specific facts demonstrating a genuine issue exists for trial. *Dresher* at 293; *Hall v. Ohio State Univ. College of Humanities*, 10th Dist. No. 11AP-1068, 2012-Ohio-5036, ¶ 12, citing *Henkle v. Henkle*, 75 Ohio App.3d 732, 735 (12th Dist.1991). "Requiring that the moving party provide specific reasons and evidence gives rise to a reciprocal burden of specificity for the non-moving party." *Mitseff v. Wheeler*, 38 Ohio St.3d 112, 115 (1988). "A motion for summary judgment forces the nonmoving party to produce evidence on any issue for which that party bears the burden of production at trial." *Wing v. Anchor Media, Ltd.*, 59 Ohio St.3d 108, 111 (1991), citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

{¶ 9} Appellant's first assignment of error contends the trial court erred in granting summary judgment in favor of Wolf on appellant's claim for negligent operation of a motor vehicle.

{¶ 10} In her motion for summary judgment, Wolf argued that no genuine issues of material fact existed and that she was entitled to judgment as a matter of law on appellant's negligence claim because: (1) she owed no duty to E.R.-R., as it was not reasonably foreseeable to Wolf that E.R.-R. would suddenly run out of the darkness from the side of the roadway into her lane of travel, (2) there was no genuine issue of material fact regarding Wolf's alleged negligence as she acted reasonably in response to the dangerous situation suddenly presented by E.R.-R. running across the roadway into her lane of travel, and (3) E.R.-R. violated several traffic laws by running across the roadway into Wolf's lane of travel and was therefore negligent per se. In support of her motion, Wolf relied on evidence consisting of various depositions, affidavits, and reports, which we set forth as follows.

{¶ 11} Wolf testified by deposition that shortly after 6:15 a.m. on September 18, 2019, she was traveling northbound on McNaughten enroute to her job at a local hospital. The weather was clear; it was not foggy or rainy. Because it was dark, Wolf had her

headlights illuminated, and there was no traffic close behind or in front of her.  Sometime between 6:17 and 6:23 a.m., a child (later identified to Wolf as E.R.-R.) "quickly darted out into the road." (Wolf Depo. at 17.)  Wolf had no reason to believe and did not expect to see E.R.-R. dart out in front of her car.  Wolf first saw E.R.-R. when E.R.-R. was in the "middle of the road, moving into the northbound lane." (Wolf Depo. at 24.)  She had not seen E.R.-R. walking or running down McNaughten prior to her darting into the road.  Wolf believed E.R.-R. was "running across the street at an angle" because she "seemed to come out of nowhere"; had E.R.-R. been running perpendicular to McNaughten, Wolf would have seen her in the southbound lane.  (Wolf Depo. at 55.)  Wolf testified that "I didn't have time to respond" because E.R.-R. was no more than "10 to 15 feet in front of my car." (Wolf Depo. at 17, 24.)  Wolf further testified that "[i]t was very dark, and I didn't see until [E.R.-R.] was, like, right in front of me, and as soon as I saw [E.R.-R.], * * * my initial instinct was that if I didn't swerve, I was going to hit [E.R.-R.] straight on, and so I swerved to the left, braking to try to avoid impact." (Wolf Depo. at 17.)  Wolf believed she "bump[ed] her or clip[ped] her" with her car and that the impact caused E.R.-R. to fall to the ground.  (Wolf Depo. at 17.)  Thereafter, Wolf pulled her car into a nearby driveway and immediately ran to the side of the road.  She saw a car driving southbound on McNaughten; she "started yelling and waving my arms" in an attempt to stop the car from hitting E.R.-R.  (Wolf Depo. at 18.)  Despite her efforts, the southbound driver struck E.R.-R. and then drove away. Wolf averred that she then stood in the middle of McNaughten "with my arms up like a crossing guard to try to stop anybody else from coming." (Wolf Depo. at 18.)  Following the accident, a female motorist stopped at the scene and unsuccessfully performed CPR on E.R.-R.

{¶ 12} Wolf testified that the posted speed limit on McNaughton is 35 m.p.h.; she was driving no faster than 30 to 35 m.p.h. because "it was dark" and she was "not in a hurry" because she was ahead of schedule.  (Wolf Depo. at 21.)  She did not see any school children walking on either side of McNaughton that morning; she could not recall if there were any school buses on the road.  She did not see any signs in the area indicating that children would be boarding school buses. Wolf further attested that she was familiar with the section of McNaughten where the incident occurred, as she had driven the same route to work during the early morning hours for several years.  She had never noticed school children either walking to school or boarding school buses in that area and she had never seen a child run into the street near or in front of her.

{¶ 13} Brittany N. White, the CCS school bus driver assigned to E.R.-R.'s bus route on September 18, 2019, testified by deposition that E.R.-R.'s bus stop was located at the intersection of Cherry Hill Road ("Cherry Hill") and McNaughten. On a typical day, White picked up three to four students at the school bus stop; E.R.-R. was one of two students who had to cross McNaughten to reach the bus stop. There are no sidewalks for pedestrian traffic on McNaughten and no crosswalk in the area where E.R.-R. would have had to cross McNaughten to walk from her residence to the bus stop.

{¶ 14} White testified that she instructed the students, including E.R.-R., "[m]ultiple times" on crossing procedures. (White Depo. at 55.) Specifically, White instructed the students not to cross McNaughten until she stopped the bus, activated the bus's flashing red lights, and provided a hand signal indicating it was safe to cross. Specific to E.R.-R., White averred she told E.R.-R. she should be at the bus stop on time and to wait for White's signal before crossing McNaughten. She explicitly told E.R.-R. on at least three occasions "[d]o not cross the street before I get here." (White Depo. at 56-57, 63.) According to White, E.R.-R. indicated that she understood the instruction. She further testified it was dangerous for E.R.-R. to cross McNaughten without following the crossing procedures, particularly given the absence of a crosswalk.

{¶ 15} On September 18, 2019, White was early for her scheduled student pick-up time at the bus stop; accordingly, she parked her bus in the parking lot of a nearby business. She waited in the parking lot five to seven minutes and then drove northbound on McNaughten toward the bus stop. Before reaching the bus stop, she observed the aftermath of the accident involving E.R.-R. She did not witness the accident.

{¶ 16} Nathan M. Place, a detective with the Columbus Division of Police ("CPD") accident investigation unit, testified by deposition that he was the lead investigator of the accident involving E.R.-R. Pursuant to his investigation, Detective Place viewed the accident scene and interviewed various individuals. Due to the nature of the accident, including the dearth of physical evidence and "too many unanswered questions," Detective Place and his team were unable to perform an accident reconstruction. (Place Depo. at 17.) Detective Place attested that there were no streetlights, crosswalks or traffic lights along the stretch of McNaughten where the accident occurred. He further attested that he had not identified any witnesses, other than Wolf, who actually saw the accident.

{¶ 17} Detective Place testified that the posted speed limit on McNaughten is 35 m.p.h. and that no information developed during the course of the investigation indicated or suggested that Wolf operated her vehicle above the posted speed limit; rather, the evidence suggested that Wolf was traveling "perhaps significantly" less than 35 m.p.h. (Place Depo. at 47.) Detective Place averred that based on his investigation, Wolf did not violate any city or state traffic laws in connection with the operation of her motor vehicle and there was nothing Wolf could have done to avoid the accident. Detective Place acknowledged Wolf's interview statement that when she saw E.R.-R. run in front of her car, she instinctively swerved to the left and hit her brakes; according to Detective Place, Wolf's action in that regard was reasonable.

{¶ 18} Detective Place further testified that his investigation of the accident scene, which involved viewing E.R.-R.'s body and examining Wolf's vehicle, revealed that the minimal damage sustained to Wolf's vehicle was inconsistent with the significant injuries suffered by E.R.-R. in the accident. According to Detective Place, Wolf reported to the officers at the accident scene that a vehicle driving southbound on McNaughten ran over E.R.-R. after Wolf's vehicle knocked her to the ground. Detective Place further averred that his investigation did not reveal any evidence, through witness testimony or otherwise, to refute Wolf's explanation of how the accident occurred.

{¶ 19} As part of his deposition, Detective Place identified the "Progress of Investigation" report he prepared pursuant to his investigation. (Place Depo. at 20-21, 53.) In that report, Detective Place summarized the facts surrounding the accident as reported by Wolf and others. Detective Place confirmed that his report concludes that E.R.-R. was the sole cause of the accident. Detective Place testified that E.R-R. did not have any legal right-of-way in entering the roadway, and that E.R.-R. was not in a crosswalk when the accident occurred.

{¶ 20} Detective Place further testified that he spoke to appellant by telephone either the day of or the day after the accident; in that conversation, appellant described E.R.-R. as an "expert street-crosser" and stated that she "would have never made a mistake unless the car was speeding extremely fast." (Place Depo. at 79.) Detective Place refuted appellant's statements, stating that "[w]e know the car wasn't speeding and we know that [E.R.-R.] is not an expert street crosser because she got hit in the street." (Place Depo. at 79.)

{¶ 21} Appellant testified by deposition that on the day of the accident, she and her four children, including E.R.-R., along with a family friend, were staying with her grandmother, S.R., in an apartment on McNaughten. Appellant attested that McNaughten is a two-lane roadway, with one northbound and one southbound lane; there are no sidewalks or streetlights on McNaughten in the area where the accident occurred. Due to these issues, in conjunction with her concern about speeding drivers, appellant considered McNaughten to be a dangerous roadway.

{¶ 22} Appellant attested that E.R.-R. rode a school bus to the middle school she attended; the school bus stop was located on the east side of McNaughten at Cherry Hill. Appellant generally instructed E.R.-R. on pedestrian safety issues, i.e., be cautious, look both ways before crossing the street, do not walk in front of cars, pay attention to drivers, and walk facing oncoming traffic. As to walking to the school bus stop, particularly when it was dark, appellant told E.R.-R. that if she was early for the school bus, she could cross McNaughten before the bus arrived, as she believed it was better for E.R.-R. to do so because she could stand with her friends on the bus stop side of McNaughten rather than wait to across the street alone. She further instructed E.R.-R. that if the school bus was at or near the bus stop, she should wait for the bus driver to signal that it was safe to cross McNaughten. She did not, however, specifically instruct E.R.-R. as to the safest place to cross McNaughten on her way to the bus stop. Appellant testified E.R.-R. generally understood and followed her instructions regarding pedestrian safety rules; indeed, she had witnessed E.R.-R. cross McNaughten numerous times, and she felt comfortable enough with E.R.-R.'s judgment that she trusted her to walk alone with her six-year-old brother and cross the street.

{¶ 23} Appellant attested that on the day of the accident, S.R. drove her to work at approximately 5:45 a.m. Approximately 30 minutes after she arrived at work, appellant received a notification through social media that a child had been struck by a vehicle on McNaughten. Later that morning, she was advised by CPD detectives that E.R.-R. was killed by a vehicle driven by Wolf as she ran across McNaughten. Appellant testified that she does not know of anyone who witnessed the accident or any witnesses who would refute Wolf's version of how the accident happened, and she acknowledged that she did not witness the accident.

{¶ 24} S.R. testified by deposition that she and appellant provided E.R.-R. general instructions regarding pedestrian safety, including how to safely cross the street. However, neither had ever instructed E.R.-R. never to cross a street unless she could do so at a crosswalk or a traffic light and had never instructed E.R.-R. where to safely cross McNaughten. According to S.R., E.R.-R. obeyed the pedestrian safety rules imparted to her; she considered E.R.-R. to be responsible and "mature and responsible beyond her years" and trusted her to walk alone with her younger brother. (S.R. Depo. at 74.)

{¶ 25} S.R. testified that on most days, she drove E.R.-R. to the bus stop and waited in her car until the bus arrived; on other days, she drove E.R.-R. to the school building. However, on the morning of the accident, she was not feeling well, and she asked E.R.-R. to walk to the bus stop. Although E.R.-R. was upset about having to walk to the bus stop, she did not tell S.R. she felt uncomfortable walking alone to the school bus or that she thought it was too dangerous to do so. S.R. was not worried about E.R.-R. walking to the bus stop because she often witnessed E.R.-R. successfully cross McNaughten from the bus stop in the afternoon after school. Accordingly, she did not give E.R.-R. any special instructions about how to cross McNaughten that morning. S.R. testified that shortly after E.R.-R. left the apartment, she was notified by police that E.R.-R. had been struck by a vehicle. According to S.R., one of the police officers told her that had E.R.-R. survived the accident, he would have written her a jaywalking ticket. S.R. acknowledged that she did not witness the accident and did not know where E.R.-R.'s school bus was at the time of the accident.

{¶ 26} A.R. testified by deposition that she sometimes stayed with appellant and the children at S.R.'s apartment. She stayed at S.R.'s apartment the night before the accident. On the morning of the accident, E.R.-R. left the apartment and walked toward the school bus stop. She did not ask anyone to drive or walk her to school or the bus stop and no one offered to do so. Later that morning, police came to S.R.'s apartment and reported that E.R.-R. had been killed in a motor vehicle accident. A.R. attested that she had often experienced crossing the street with E.R.-R. and felt she was able to do so safely. She agreed with S.R.'s description of E.R.-R. as being "mature beyond her years," and she considered E.R.-R. to be responsible, conscientious, dependable, reliable and, safety conscious. (A.R. Depo. at 72.)

{¶ 27} Wolf also submitted affidavit testimony and a corresponding report from Dr. Sandra Anstaett Metzler, D.Sc., P.E., a human factors/accident reconstruction/mechanical engineering expert. In her affidavit, Dr. Metzler attested that she performed "a conspicuity and human factors engineering analysis of the Accident to evaluate the actions of [Wolf] and [E.R.-R.] with respect to accident causation" and prepared a report of her findings. (Metzler Aff. at ¶ 3, 6.) In her report, Dr. Metzler indicated that she reviewed the available physical and testimonial evidence in the case as well as pertinent biomedical and human factors research and literature. Following review of these materials, Dr. Metzler concluded that Wolf was faced with a sudden and immediate hazard in the form of E.R.-R. running across the roadway and about to enter the lane in which she was driving, that Wolf would have reasonably expected that E.R.-R. would continue moving along the same trajectory and therefore proceed into her lane of travel, that Wolf made an accident-avoidance maneuver using a combination of braking and steering that came very close to avoiding contact with E.R.-R., that Wolf reacted and responded to the immediate hazard in a reasonable and understandable manner consistent with human factors research and literature, and that Wolf likely performed better than the average alert and attentive driver. In so concluding, Dr. Metzler emphasized that it would have been difficult for Wolf to discern and recognize E.R.-R. when she first entered the roadway due to the combination of it being dark outside, there being no streetlights, and the fact that E.R.-R. was wearing dark clothing.

{¶ 28} Appellant filed a response to Wolf's motion for summary judgment, advancing three arguments: (1) Wolf owed E.R.-R., an 11-year-old child, a heightened duty of care, (2) Wolf negligently left her lane of travel, thereby forfeiting her right of way, and (3) subsequent to her colliding with E.R.-R., Wolf negligently walked into the path of the second vehicle, thereby causing the second driver to collide with E.R.-R. Appellant

supported her memorandum in opposition with the deposition testimony of Sandra F. Eubanks and John Aleshire.[2]

{¶ 29} In her deposition testimony, Eubanks averred that at approximately 6:10 or 6:15 a.m. on September 18, 2019, she was driving southbound on McNaughten on her way to work. Because it was very dark and there were no streetlights, she drove very slowly; Eubanks estimated her speed to be between 5 and 10 m.p.h. Eubanks attested that she observed E.R.-R. lying in the middle of the lane in front of her vehicle; a woman (Wolf) was standing on the edge of the road waving frantically at her to stop. Eubanks stopped her vehicle, and at Wolf's urging, called 911. Eubanks testified she was glad Wolf flagged her down; otherwise, she "probably would have run over" E.R.-R. because she would not have seen her. She left the area soon thereafter and went to work. Eubanks later called police and reported that she thought she had seen children walking along McNaughten "some ways away from where the accident happened," which caused her to slow her speed. (Eubanks Depo. at 24.)

{¶ 30} Eubanks further attested that on other mornings prior to the day of the accident, she observed children walking along McNaughten or walking to bus stops, but "[n]ot particularly over there where * * * I'm saying I saw someone. Kids are usually right on the corner of Billington and McNaughten before I make the turn [from Billington to

---

[2] Appellant also supported her memorandum contra with the report of her expert, accident reconstructionist Eric Brown. In his report, Brown stated that he reviewed and analyzed the available evidence relative to the accident and applied physics and scientific law and principles to that evidence. Upon his review, Brown found that the accident occurred entirely within the southbound lane of McNaughten. Brown further found that E.R.-R. did not cross into the northbound lane of travel in front of Wolf's vehicle; rather, Wolf, in an attempt to avoid E.R.-R., changed course and swerved toward E.R.-R. Accordingly, Brown opined that E.R.-R. did not "dart out" in front of Wolf's vehicle. (Report at 30.) Brown concluded, based upon the final resting positions of E.R.-R. and Wolf's vehicle, the angle of impact, the location of the debris field, the nature and extent of damage to Wolf's vehicle, the time and distance relationship of the involved parties, the deposition testimonies of Wolf and other witnesses, and the application of physics and scientific laws and principles, that Wolf violated R.C. 4511.33(A) when she moved her vehicle from the lane in which she was operating without first ascertaining that such movement could be made safely and was, therefore, at fault for the accident. On August 1, 2023, Wolf moved to strike Brown's report on two grounds: (1) the report was unauthenticated and thus not proper Civ.R. 56(C) evidence, and (2) the opinions included in the report constituted improper legal conclusions. On August 22, 2023, appellant responded to the motion to strike, arguing that Brown's report was authenticated through his sworn deposition testimony filed August 22, 2023 and that the opinions set forth in the report were not improper. Appellant filed in this court only the second of two volumes constituting Brown's deposition testimony. In its decision and entry, the trial court did not reference Brown's report other than to find appellant's motion to strike the report to be moot given its disposition granting Wolf's motion for summary judgment. Upon remand, the trial court may reconsider the motion if it determines appropriate to do so.

McNaughten]." (Eubanks Depo. at 31.) She further testified that she did not know whether there was a bus stop at the intersection of Cherry Hill and McNaughten and could not recall ever seeing children standing at the bus stop or having to stop because children were boarding a school bus in the morning. She also testified that she had seen children boarding school buses in the morning "up and down McNaughten." (Eubanks Depo. at 43.) However, on the morning of the accident, she did not see any children boarding school buses or walking along McNaughten. Eubanks testified that because it was "extremely dark" that morning, she would have driven 5 to 10 m.p.h. regardless of whether she knew that children boarded school buses on McNaughten. (Eubanks Depo. at 45.)

{¶ 31} When asked whether she believed it was safe for a child to have to cross McNaughten to get to the bus stop at Cherry Hill, Eubanks averred that it was dangerous for anyone to cross McNaughten, day or night, because drivers often exceed the speed limit and there are no sidewalks. She acknowledged, however, that she did not know where E.R.-R. lived and was not aware that E.R.-R. had to cross McNaughten in order to get to her bus stop. She further testified she could not recall any signs on McNaughten warning that children are boarding school buses in the area.

{¶ 32} In his deposition testimony, Aleshire averred that on September 18, 2019, he lived on McNaughten very near the site of the accident involving E.R.-R. Indeed, Aleshire attested that the accident happened "right in front of my driveway." (Aleshire Depo. at 8.) As to the particulars of the accident, Aleshire averred that at approximately 6:15 a.m., he walked outside to retrieve his trash can. He observed a vehicle traveling northbound on McNaughten; the vehicle's headlights were illuminated, and it appeared to be traveling within the posted speed limit. He noticed something moving at "a fast pace" across McNaughten and then heard a "commotion." (Aleshire Depo. at 37, 12.) He then saw E.R.-R. lying in the center of the road a foot or two north of his driveway; he attributed the "commotion" to the northbound vehicle having struck E.R.-R. (Aleshire Depo. at 12.) He then observed the driver of the northbound vehicle (Wolf) standing by the side of the road across the street from his home, yelling and waving her hands at southbound traffic in an apparent effort to get drivers to avoid striking E.R.-R. He then saw a second vehicle traveling southbound in the northbound lane, which Aleshire surmised to be an effort by the southbound driver to swerve to miss Wolf standing at the side of the road. Aleshire

speculated that if the southbound driver had not swerved, the driver would likely have hit Wolf instead of E.R.-R.

{¶ 33} Aleshire testified there is no crosswalk near where the accident occurred. He acknowledged that he did not see any vehicle strike E.R.-R. that morning. He also acknowledged that prior to the accident, he had never seen E.R.-R. crossing McNaughten or running to the bus stop in the morning. He further acknowledged that he did not see any children other than E.R.-R. in the area that morning. However, he testified that prior to the accident, he had seen children on McNaughten in the morning walking toward the bus stop and/or boarding the school bus; accordingly, he customarily drove under the posted speed limit.

{¶ 34} In her reply memorandum in support of her motion for summary judgment, Wolf argued that she owed no duty to E.R.-R., that appellant's claim regarding Wolf's alleged negligence in exiting her vehicle after striking E.R.-R. and positioning herself in the roadway, thereby causing the second driver to hit E.R.-R., should not be considered because it was not raised in the complaint, was barred by R.C. 2305.23, Ohio's Good Samaritan Act, and was otherwise not supported by the evidence, and that appellant's claims are barred by E.R.-R.'s comparative negligence.

{¶ 35} The trial court granted Wolf's motion for summary judgment, stating in pertinent part:

> Ms. Wolf's actions in the instant case were reasonable under the circumstances presented. Here, it is undisputed that it was dark when [E.R.-R.] ran across McNaughten Road not in a designated crosswalk area. * * *
>
> In reviewing the facts, the Court finds that Ms. Wolf acted reasonably given the circumstances. There was no reason for her to expect to encounter a pedestrian in the middle of McNaughten Road in the early morning hours. [Appellant] has offered no evidence, case law or otherwise, demonstrating that Ms. Wolf owed a duty to [E.R.-R.], or contradicting that Ms. Wolf acted reasonably. Upon reviewing the Court's record, the Court finds that Ms. Wolf did not owe a duty to [E.R.-R.] and that [appellant] has not demonstrated a material issue of fact that Ms. Wolf was negligent.

(Dec. 1, 2023 Decision & Entry at 5-6.)

{¶ 36} Therefore, the trial court made two findings. First, the court found there was no duty. Second, having found there was no duty, it was not necessary to consider whether Wolf was negligent, i.e., whether she breached a duty; nevertheless, the court also found that Wolf acted reasonably given the circumstances.

{¶ 37} Appellant frames the issue before the court as whether the trial court erred in holding Wolf was not negligent. In support, she argues that: (1) the trial court erred in finding Wolf owed no duty to E.R.-R.; and (2) the trial court erred in not finding Wolf acted negligently when she encountered E.R.-R. in the roadway, "deviating from [Ms. Wolf's] lane of travel" and not continuing in her lane of travel "[so] the accident could have been avoided entirely." (Appellant's Brief at 26.)[3]

{¶ 38} Regarding her argument that the trial court erred in concluding that Wolf owed no duty to E.R.-R., appellant first maintains that "[t]he trial court erred when it determined that there 'was no reason to encounter a pedestrian in the middle of McNaughten Road in the early morning hours.' To the contrary, the testimony from the witnesses who were at or around the scene established that Ms. Wolf should have expected children to be crossing the street to board school buses that morning." (Appellant's Brief at 20-21.) Appellant argues that Wolf "owed a heightened duty of care to [E.R.-R.] due to the accident's location, an area she knew or should have known to be frequented by children. Given her regular travel through that area for work, Ms. Wolf should have been aware of children boarding buses there. Other drivers who traversed the same area testified that they exercised greater caution, anticipating the presence of children." (Appellant's Brief at 25-26.)

---

[3] As noted previously, appellant also argues the trial court erred in not finding Wolf acted negligently after she struck E.R.-R. by running into the road and positioning herself in the southbound lane which appellant alleges led to the second vehicle swerving and ultimately running over E.R.-R. Specifically, appellant contends that Wolf owed E.R.-R. a duty to act in accordance with applicable traffic laws related to pedestrians. Appellant maintains that R.C. 4511.46 prohibited Wolf from leaving the side of the road and running into the path of the vehicle that struck E.R.-R. Appellant contends that "[b]ased on the testimony of both Ms. Wolf and Mr. Aleshire * * * [a]fter colliding with [E.R.-R.] and causing her to fall onto the road, Ms. Wolf left her vehicle and positioned herself as a pedestrian in the southbound lane. Meanwhile, [E.R.-R.] remained on the road. As the second vehicle approached, Mr. Aleshire testified it had to swerve to evade Ms. Wolf, causing it to run over [E.R.-R.]." (Appellant's Brief at 27.) Wolf pointed out in her reply to appellant's memorandum contra summary judgment that appellant did not allege in her complaint that Wolf was negligent when she walked into the path of the second vehicle. As it was not raised, the trial court did not address this argument. Neither will we. In her complaint, appellant alleged only that Wolf "operated her motor vehicle in a negligent manner." (Compl. at ¶ 33, 53.) She cannot now raise new claims at the appellate level. Therefore, we decline to address appellant's argument that Wolf was negligent when she walked into the path of the second vehicle.

{¶ 39} To prevail on her claim of negligence, appellant was required to prove by a preponderance of the evidence that Wolf owed E.R.-R. a duty of care, that Wolf breached that duty, and that the breach proximately caused E.R.-R.'s injuries. *Estate of Coumbassa v. Hickle*, 10th Dist. No. 22AP-788, 2023-Ohio-4292, ¶ 31, citing *Wheeler v. Ohio State Univ.*, 10th Dist. No. 11AP-289, 2011-Ohio-6295, ¶ 14, citing *Chambers v. St. Mary's School*, 82 Ohio St.3d 563, 565 (1998), citing *Wellman v. E. Ohio Gas Co.*, 160 Ohio St.3d 103, 108-09 (1953). " 'A person's failure to exercise ordinary care in doing or failing to do something will not amount to actionable negligence unless such person owed to someone injured by such failure a duty to exercise ordinary care.' " *Snay v. Burr*, 167 Ohio St.3d 123, 2021-Ohio-4113, ¶ 14, quoting *United States Fire Ins. Co. v. Paramount Fur Serv., Inc.*, 168 Ohio St. 431 (1959), paragraph three of the syllabus. "In other words, if there is no duty then there can be no liability for negligence." *Id.*, citing *Jeffers v. Olexo*, 43 Ohio St.3d 140, 142 (1989). "Unlike the question whether a defendant has properly discharged an applicable duty of care, which is generally a question of fact for the jury, * * * the question whether a duty exists to begin with is a question of law for the court." *Id.*, citing *Mussivand v. David*, 45 Ohio St.3d 314, 318 (1989).

{¶ 40} " '[A] defendant's duty to a plaintiff depends upon the relationship between the parties and the foreseeability of injury to someone in the plaintiff's position.' " *Snay* at ¶ 15, quoting *Simmers v. Bentley Constr. Co.*, 64 Ohio St.3d 642, 645 (1992). "An injury is foreseeable if a reasonably prudent person under the same or similar circumstances as the defendant should have known that the conduct in question was likely to result in injury to the plaintiff or to someone in a like situation." *Id.*, citing *Commerce & Industry Ins. Co. v. Toledo*, 45 Ohio St.3d 96, 98 (1989). "Forseeability alone, however, is not always sufficient to establish a duty of care." *Id.*, citing *Estates of Morgan v. Fairfield Family Counseling Ctr.*, 77 Ohio St.3d 284, 293 (1997).

{¶ 41} Regarding motor vehicle accidents, this court has stated " '[t]he fact that a vehicle hits an individual on a roadway does not establish negligence.' " *Coumbassa* at ¶ 31, quoting *Paulino v. McCary*, 10th Dist. No. 04AP-1186, 2005-Ohio-5920, ¶ 11, citing *Dixon v. Nowakowski*, 6th Dist. No. L-98-1372 (Aug. 27, 1999). "Negligence must always be proven; it is never presumed." *Id.*, citing *Paulino* at ¶ 11, citing *Biery v. Pennsylvania RR. Co.*, 156 Ohio St. 75 (1951), paragraph two of the syllabus. " ' "In an action based on

negligence, the presumption exists that each party was in the exercise of ordinary care and such presumption prevails until rebutted by evidence to the contrary.' ' " *Id.*, quoting *Paulino*, quoting *Biery* at paragraph two of the syllabus. " '[U]nder Ohio law, a driver traveling lawfully in her lane normally has no duty to look out for pedestrians in front of her, but a driver does have a duty to take reasonable steps to avoid colliding with a pedestrian in her right-of-way once the driver discovers a dangerous situation.' " *Coumbassa* at ¶ 32, quoting *Clark v. Whaley*, 590 F.Supp.3d 1081, 1085 (S.D.Ohio 2022), citing *Snider v. Nieberding*, 2d Dist. No. CA2002-12-105, 2003-Ohio-5715, ¶ 9, citing *Deming v. Osinski*, 24 Ohio St.2d 179, 181 (1970).

{¶ 42} When the pedestrian involved in a motor vehicle accident is a child, this court has held that " 'the amount of care required to discharge a duty owed to a child of tender years is necessarily greater than that required to discharge a duty owed to an adult under the same circumstances.' " *Sargent v. United Transp. Co.*, 56 Ohio App.2d 159, 162 (10th Dist.1978), quoting *Di Gildo v. Caponi,* 18 Ohio St.2d 125, 127 (1969). *See also Ball v. Stark*, 10th Dist. No. 11AP-177, 2013-Ohio-106, ¶ 67 (citing *Sargent* for the proposition that the amount of care required to discharge a duty owed to a child is greater than that required to discharge a duty owed to an adult). Other appellate courts have held similarly. In *Williams v. Putnam Transfer & Storage Co.*, 8th Dist. No. 65659, 1994 Ohio App. LEXIS 352 (Feb. 3, 1994), the court held that "case law imposes a higher standard of care on operators of motor vehicles when (1) a child pedestrian is involved; (2) children may reasonably be expected to be in the vicinity; or (3) the driver becomes aware of a perilous situation." *Id.* at *4, citing *Sargent*. In *Rayoum v. Adams*, 6th Dist. No. L-97-1370, 1998 Ohio App. LEXIS 3362 (July 4, 1998), the court held that "[i]n cases where the driver of a motor vehicle knows of the presence of children in, near, or adjacent to the street or highway, or should know that children may reasonably be expected to be in the vicinity, the driver is under a heightened duty to exercise ordinary care for the safety of the child or children." *Id.* at *8, citing *Williams*. *See also Foulke v. Beogher*, 169 Ohio App.3d 435, 2006-Ohio-1411, ¶ 10 (3d Dist.); *Young v. Edgington*, 12th Dist. No. CA91-08-014, 1992 Ohio App. LEXIS 1931, *5; *Penrod v. Mineral Trucking*, 5th Dist. No. 2014 AP 10 0044, 2015-Ohio-3493, ¶ 18.

{¶ 43} Appellant argues genuine issues of material facts exist as to whether Wolf breached the heightened duty of ordinary care owed to E.R.-R., an 11-year-old child. In its

decision, the trial court did not address whether the heightened duty of ordinary care applied. Thus, the threshold issue on appeal is whether Wolf fell subject to the heightened duty of ordinary care. Wolf testified that she was familiar with the section of McNaughten where the accident occurred, as she had driven the same route to work during the early morning hours for several years. She did not see any school children walking on either side of McNaughten that morning, did not see any signs in the area indicating that children would be boarding school buses, and had never noticed school children either walking to school or boarding school buses in the area. However, Eubanks testified that although she did not see any children boarding school buses or walking along McNaughten on the morning of the accident, she had on other early mornings seen children boarding school buses in the area. Aleshire also testified that while he did not see any children in the area on the morning of the accident, he had seen children walking toward the bus stop and/or boarding the school bus on other mornings preceding the accident.

{¶ 44} Given the testimony offered by Eubanks and Aleshire establishing that children would have reasonably been expected to be walking along and/or boarding school buses in the early morning in the area of McNaughten where the accident occurred, we conclude the trial court erred in not considering whether the children were reasonably expected to be in the vicinity and if the heightened duty of care applied.

{¶ 45} The trial court must first determine the question of duty before determining if there was a breach of duty (if any). Therefore, we decline at this time to address the question of breach.

{¶ 46} For the foregoing reasons, the first assignment of error is sustained.

{¶ 47} Appellant's second assignment of error contends the trial court erred in granting summary judgment in favor of CCS on her claims for negligent operation of a motor vehicle under R.C. 2744.02(B)(1) and reckless actions under R.C. 2744.03(A)(6)(b).

{¶ 48} In its motion for summary judgment, CCS argued that no genuine issues of material fact existed and that it was entitled to judgment as a matter of law based upon the doctrine of political subdivision immunity and, alternatively, E.R.-R.'s comparative negligence. Specifically, CCS argued that it was entitled to immunity on appellant's claim for negligent operation of a motor vehicle under R.C. 2744.02(B)(1) for two reasons: (1) there was no "operation" of the school bus, as it was not involved in the accident and

had not yet arrived at the bus stop, and (2) establishment of a bus stop location does not constitute "operation of a motor vehicle." CCS also asserted it was entitled to immunity on appellant's R.C. 2744.03(A)(6)(b) claim that CCS's decision to locate the bus stop on McNaughten and Cherry Hill constituted wanton and reckless conduct. CCS argued that reliance on that provision was misplaced, as its applicability was limited to circumstances involving employee immunity and appellant never named an employee of CCS as a defendant. As to its comparative negligence argument, CCS maintained that E.R.-R. violated several traffic laws when she ran across McNaughten outside a crosswalk prior to the arrival of the bus at the bus stop despite having been generally instructed how to safely cross McNaughten and having been specifically instructed to wait until the bus arrived at the bus stop before crossing McNaughten. In support of its arguments, CCS cited the deposition testimony of appellant, S.R., White, Detective Place, A.R., and Wolf regarding the facts of the case; the testimony upon which CCS relies has been set forth in our discussion of the first assignment of error.

{¶ 49} Appellant filed a response to CCS's motion for summary judgment, asserting that the "decision of [CCS] regarding the placement and timing of school bus stops is a discretionary function of [CCS]," and that "because this decision was a discretionary one, [CCS] loses its immunity if the judgment of its members or the person authorized to act on behalf of [CCS] pursuant to [Ohio Adm.Code] 3301-83-13(A) was 'exercised with malicious purpose, in bad faith, or in a wanton or reckless manner.' R.C. 2744.03(A)(5)." Appellant argued that "[CCS] cannot claim immunity for its wanton and reckless decision regarding the placement of the bus stop location." (July 25, 2023 Memo. In Opp. at 5.) In support of her memorandum in opposition, appellant cites deposition testimony offered by White, Tania Washington, Judy Collmar, and her expert, Darryl Fennell, along with his November 2, 2022 report.[4]

{¶ 50} During her deposition, White was questioned regarding whether bus drivers have any input or can affect the decision as to where a particular CCS bus stop will be located. White testified that bus drivers may "submit a request" to have a bus stop location changed and that she had submitted a verbal request to her supervisors, Washington and

---

[4] Appellant's memorandum contra also purported to rely upon the deposition testimony of Steven McElroy, executive director of operations for CCS with oversight of CCS's transportation department during the 2019-2020 school year. McElroy's deposition testimony is not part of the appellate record.

Collmar, approximately two weeks after the 2019-2020 school year began (which was prior to the accident at issue) to see if it would be feasible to change the direction of the bus for the bus stop located at Cherry Hill and McNaughten (which had been added for the 2019-2020 school year). White averred that Washington and Collmar looked at a map of the bus route and told White they would "see what could be done" based on the number, location, and direction of the bus stops and the location of the school. (White Depo. at 59.) White attested that following this discussion, she "never heard anything back" from her supervisors regarding her request. (White Depo. at 23.) She further testified that she did not know whether anyone from the CCS transportation department inspected the bus stop location prior to E.R.-R.'s accident.

{¶ 51} White further testified that the process generally utilized by CCS to review whether bus stop locations are unsafe or potentially hazardous involves reliance on bus drivers submitting requests for location changes. Upon those submissions, a transportation supervisor conducts an on-site review of locations if "needed." (White Depo. at 34.) White averred that she did not know the name of the person who conducted such reviews and did not know how the decision was made to inspect potentially unsafe bus stops. White further attested that she did not know whether the transportation department evaluated safety issues and potential hazards prior to placing a bus stop at a particular location.

{¶ 52} Washington, a CCS transportation supervisor, testified during her deposition that pursuant to CCS procedures during the 2019-2020 school year, a bus driver concerned about hazardous or unsafe bus stop locations would verbally report that concern to their immediate supervisor, who, in turn, would provide the information to a routing supervisor, who, in turn, would forward the information to the road supervisor, who would then investigate the issue. Washington was White's supervisor during the 2019-2020 school year. She did not recall receiving a verbal complaint from White regarding the bus stop at McNaughten and Cherry Hill and had no documentation (via text or email) substantiating White's claim that she lodged a verbal complaint. Washington did not know if CCS bus stops are inspected for safety and/or hazards either prior to or during the school year and did not know if bus stop locations were ever changed based on bus driver complaints. She

was not sure who established the bus stop locations for CCS in 2019 and did not know the process for getting a bus route changed in 2019.

{¶ 53} In her deposition, Collmar, a CCS transportation supervisor, testified that she was unaware of any training CCS bus drivers receive regarding how to identify potential hazards or conditions that would make a bus stop location unsafe. She did not know who establishes and determines the bus stop locations for CCS. She did not know how bus stops were evaluated for potential safety hazards during the 2019-2020 school year other than via input from bus drivers. She echoed Washington's testimony regarding the process for identifying potential hazards at bus stop locations, i.e., bus driver complaint to supervisor forwarded to router then forwarded to road supervisor, who was charged with reviewing the potential problem. She was unsure whether a bus stop location that was the subject of a complaint from a bus driver was always inspected in person. She did not recall receiving a verbal complaint from White regarding the bus stop at McNaughten and Cherry Hill and had no documentation (via email) substantiating White's claim that she lodged a verbal complaint.

{¶ 54} Fennell testified by deposition and identified a report he prepared on November 2, 2022 as a "School Bus and Student Transportation Expert" for Robson Forensics following his investigation of the "actions and/or inactions of the Columbus City School District (CCSD) and Columbus City School Bus Services (CCSBS) to determine if they created unsafe conditions that contributed to or were causative of [E.R.-R.'s] death, and if those actions or inactions met the standard of care for the safe transportation of students." (Nov. 2, 2022 Report at 2.) In his report, Fennell opined that CCS: (1) "knew or should have known that the conditions at the incident bus stop were unsafe," (2) "failed to train their supervisors to acknowledge or respond to the driver's complaint regarding safety," (3) "failed to establish a standard operating procedure that responded to potentially hazardous conditions at a bus stop location," (4) "failed to develop a systematic process of evaluating their bus routes for potential hazards" and (5) "failed to establish a comprehensive pedestrian education program consistent with the guidelines of the Columbus County School District Safe Routes to School." Fennell concluded that "[t]he actions or inactions of [CCS], collectively and separately, created a dangerous condition

that violated the standard of care for safe student transportation and caused or contributed to [E.R.-R.'s] death." (Nov. 2, 2022 Report at 16.)

{¶ 55} When questioned about his report, Fennell acknowledged the factual circumstances of the case, i.e., that the school bus was not at the bus stop when the accident occurred and was not involved in the accident and that E.R.-R. was not crossing the street at the bus stop location; rather, she was approximately a quarter mile away from the bus stop when she attempted to cross McNaughten and was not in a crosswalk when she did so. Fennell further acknowledged White's deposition testimony that she instructed E.R.-R. not to cross McNaughten until the bus arrived at the bus stop and that E.R.-R. did not wait for the bus to arrive before she attempted to cross. Regarding the establishment of the bus stop location, Fennell acknowledged that Ohio law does not prohibit a student from having to cross a two-lane street to get to their designated bus stop.

{¶ 56} When asked by appellant's counsel to opine whether CCS's actions or inactions were reckless, Fennell attested that "[r]eckless is a good word because * * * they failed to do anything to mitigate the known risks the driver brought to their attention." (Fennell Depo. at 116.) Counsel for CCS objected and moved to strike the testimony on two bases—that such opinion was not included in Fennell's report and there was no allegation in the case pertaining to CCS' alleged recklessness.

{¶ 57} In its reply memorandum in support of its motion for summary judgment, CCS argued that the deposition testimony provided by White, Collmar, and Washington did not create a genuine issue of material fact as to whether CCS was entitled to the immunity afforded political subdivisions.[5] As to Fennell's report, CCS argued that it was due no consideration because it did not constitute a deposition, testimony or affidavit, and that the opinions contained therein were not material to the issue of whether there is an exception to political subdivision immunity for the establishment of the location of a bus stop. CCS also noted that appellant failed to address its argument regarding E.R.-R.'s comparative negligence.

---

[5] CCS also maintained that McElroy's deposition testimony did not create a genuine issue of material fact as to whether CCS was entitled to political subdivision immunity. As already noted, McElroy's deposition testimony is not part of the appellate record.

{¶ 58} CCS attached to its reply memorandum the expert reports and authenticating affidavits of its experts, Peter Japikse and Bradley A. Danielson.[6] In his report, Japikse concluded that E.R.-R. "failed to follow the instructions provided by her school bus driver, failed to observe the right of way of traffic in a roadway, [and] crossed the roadway at an unauthorized location without the benefit of streetlights or traffic controls." (May 11, 2023 Report at 7.) Japikse further concluded that the accident "was not related to the district's school transportation program. The child was not at the bus stop in her designated place of safety. Had she walked on the resident side of McNaughten the remaining distance to her bus stop, she could have crossed safely with the protection of the traffic control devices on the school bus and the bus driver's care." (May 11, 2023 Report at 7.) In his report, Danielson opined that "the established bus stop at the location of Cherry Hill Drive and McNaughten Road was in compliance with Ohio guidelines," "was not a hazardous stop," that "[h]ad [E.R.-R.] on the day of the accident followed the instructions of the bus driver, and walked along the west side of McNaughten Road until she reached the northern point of McNaughten Road directly across from her bus stop, she could have safely waited there until the bus arrived. The driver would have stopped all traffic, and given her the hand signal to safely cross McNaughten Road." (Danielson Aff., Ex. 2 at 3.)

{¶ 59} The trial court granted CCS's motion for summary judgment. In doing so, the court applied the three-tiered analysis set forth in R.C. Chapter 2744 for determining whether CCS was immune from liability. As to the first tier of the analysis under R.C. 2744.02(A)(1), the court found that CCS was a political subdivision engaged in a governmental function at the time of the accident and was thus entitled to the general grant of immunity. Regarding the second-tier of the analysis under R.C. 2744.02(B), the court noted that a political subdivision entitled to the general grant of immunity afforded by R.C. 2744.02(A)(1) could be held liable for damages under certain exceptions delineated in R.C. 2744.02(B)(1) through (5). The court then stated:

> Plaintiff's complaint relies on the first exception [under R.C.
> 2744.02(B)(1)], negligent operation of a motor vehicle, to find

---

[6] In its reply memorandum, CCS asserted "while it is not relevant or material for the Court to consider the opinion of experts in this context of summary judgment based upon the narrow causes of action in the Complaint against [CCS], [CCS] did retain two experts, Mr. Japikse and Mr. Danielson who both opine that [CCS's] actions were in compliance with Ohio law, and with any applicable standard of care. So this Court is not given the wrong impression by the irrelevant and immaterial opinions of Mr. Fennell, the reports of Mr. Japikse and Mr. Danielson are attached hereto as Exhibits 1 and 2." (CCS Reply Memo. at 4, fn. 1.)

Columbus City Schools liable. Columbus City Schools argues that the bus was not involved in this accident. The bus was not on McNaughten Road at the time but was parked in the nearby parking lot awaiting the proper time to drive toward the bus stop. Plaintiff offers nothing to dispute these facts. The Court does not find that an exception under R.C. 2744.02(B) applies.

(Dec. 1, 2023 Decision & Entry at 4.)

{¶ 60} As to the third tier of the analysis under R.C. 2744.03(A), the court stated:

Even if one of the exceptions to immunity under R.C. 2744.02(B) were applicable, the Court finds that Columbus City Schools still [has] an absolute defense to liability under R.C. 2744.03(A)(3), as well as R.C. 2744.03(A)(5). Ohio Revised Code 2744.03 states in pertinent part as follows:

(A) In a civil action brought against a political subdivision or an employee of a political subdivision to recover damages for injury, death, or loss to person or property allegedly caused by any act or omission in connection with a governmental or proprietary function, the following defenses or immunities may be asserted to establish non liability:

* * *

(3) the political subdivision is immune from l[i]ability if the action or failure to act by the employee involved that gave rise to the claim of liability was within the discretion of the employee with respect to policy-making, planning, or enforcement powers by virtue of the duties and responsibilities of the office or position of the employee.

* * *

(5) the political subdivision is immune from liability even if the injury, death, or loss to person or property resulted from the exercise of judgment or discretion in determining whether to acquire, or how to use, equipment, supplies, materials, personnel, facilities, and other resources unless the judgment or discretion was exercised with malicious purpose, in bad faith, or in a wanton or reckless manner.

* * *

Plaintiff points to testimony of its expert arguing that the location of the bus stop was unsafe, and Columbus City

> Schools acted in a reckless manner by failing to change the location of the bus stop. The Court notes that Plaintiff's complaint does not identify any employee or agent by name. Further, Plaintiff does not direct the Court to specific material facts or case law contrary to Columbus City School's position. Plaintiff references the general accusations made by several experts, but those do not defeat the legal elements at issue.

(Dec. 1, 2023 Decision & Entry at 4-5.)

{¶ 61} At issue in this case is whether the trial court erred in granting summary judgment to CCS on the basis that it is entitled to political subdivision statutory immunity under R.C. Chapter 2744. The Political Subdivision Tort Liability Act, as codified in R.C. Chapter 2744, sets forth a three-tiered analysis for determining whether a political subdivision is immune from liability. *Cater v. Cleveland*, 83 Ohio St.3d 24, 28 (1998).

{¶ 62} The first tier of the analysis involves the application of R.C. 2744.02(A)(1), which states in pertinent part: "Except as provided in division (B) of this section, a political subdivision is not liable in damages in a civil action for injury, death, or less to person or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or propriety function." A school district is a political subdivision subject to the provisions of R.C. Chapter 2744. *Doe v. Marlington Local School Dist. Bd. of Edn.*, 122 Ohio St.3d 12, 2009-Ohio-1360, ¶ 11. Governmental functions include providing a system of public education. *Id.*, citing R.C. 2744.01(C)(2)(c). Further, the transportation of students to and from school is a governmental function. *Id.*

{¶ 63} Under the second-tier of the analysis, the general immunity afforded by R.C. 2744.02(A)(1) to a political subdivision is not absolute, but is, by its express terms, subject to the five statutory exceptions set forth in R.C. 2744.02(B). *Id.* at ¶ 12, citing R.C. 2744.02(B)(1) through (5). As relevant here, R.C. 2744.02(B)(1) provides:

> Subject to sections 2744.03 and 2744.05 of the Revised Code, a political subdivision is liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by an act or omission of the political subdivision of any of its employees in connection with a governmental or propriety function, as follows:

(1) Except as otherwise provided in this division, political subdivisions are liable for injury, death, or loss to person or property caused by the *negligent operation of any motor vehicle* by their employees when the employees are engaged within the scope of their employment and authority.

(Emphasis added.)

**{¶ 64}** " ' "Finally, under the third tier of analysis, immunity can be reinstated if the political subdivision can successfully argue that any of the defenses contained in R.C. 2744.03 applies." ' " *Rankin v. Cuyahoga Cty. Dept. of Children & Family Servs.*, 118 Ohio St.3d 392, 2008-Ohio-2567, ¶ 27, quoting *Hortman v. Miamisburg*, 110 Ohio St.3d 194, 2006-Ohio-4251, ¶ 12, quoting *Cater* at 28.  Analysis under the third tier is unnecessary if none of the exceptions set forth in R.C. 2744.02(B) apply.  *Doe v. Jackson Local School Dist.*, 5th Dist. No. 2006CA00212, 2007-Ohio-3258, ¶ 25; *Glover v. Dayton Pub. Schools*, 2d Dist. No. 17601, 1999 Ohio App. LEXIS 3706, *10 ("R.C. 2744.03 does not provide a separate basis for liability against the school district, and is relevant only if one of the listed exceptions to immunity in R.C. 2744.02(B) has first been found to exist.").

**{¶ 65}** Appellant does not dispute that CCS is entitled to the general grant of immunity afforded under R.C. 2744.02(A)(1).  Rather, appellant contends the general grant of immunity was circumvented by the exception to immunity set forth in R.C. 2744.02(B)(1) for "negligent operation of any motor vehicle."  Thus, resolution of this case depends upon what the term "operation of" a motor vehicle means pursuant to R.C. 2744.02(B)(1).

**{¶ 66}** As noted by the Supreme Court of Ohio in *Marlington*, the term "operation" is not defined by R.C. 2744.02.  *Id.* at ¶ 17.  In *Marlington*, the court considered whether a school bus driver's supervision of student passengers on a school bus constituted operation of a motor vehicle within the statutory exception to political subdivision immunity under R.C. 2744.02(B)(1).  That issue turned on an interpretation of the term "operation" as it was used in the statute.  *Id.*  The court noted the General Assembly's definition of "operate" provided in R.C. 4511.01(HHH), that is, "to cause or have caused movement of a vehicle, streetcar, or trackless trolley."  The court stated that "[a]lthough the R.C. 2744.02(B)(1) exception to immunity for the negligent operation of a motor vehicle predates the General Assembly's addition of R.C. 4511.01(HHH)'s definition of 'operate,' that definition nevertheless sheds light on the meaning of 'operation' in R.C. 2744.02(B)(1)."  *Id.* at ¶ 24.

The court also noted that the definition of "operate" found in R.C. 4511.01(HHH) was "generally consistent with the interpretation courts have given to 'operation' under R.C. 2744.02(B)(1)." *Id.* at ¶ 25. The court concluded that "the exception to immunity in R.C. 2744.02(B)(1) for the negligent operation of a motor vehicle pertains only to negligence in driving or otherwise causing the vehicle to be moved." *Id.* at ¶ 26. The court found that the language utilized in R.C. 2744.02(B)(1) was not so expansive as to include supervising the conduct of student passengers. *Marlington.*

{¶ 67} While acknowledging the *Marlington* court's conclusion that the exception to immunity for negligent operation of a motor vehicle pertains only to negligence in driving or otherwise causing the vehicle to be moved, as well as the undisputed evidence in this case that the school bus was not involved in the accident, was not being driven at the time of accident, and was parked in a nearby parking lot to await the proper time to drive toward the bus stop, appellant nonetheless maintains that for purposes of R.C. 2744.02(B)(1), the "operation of a motor vehicle" encompasses activities extending beyond the conventional definition of driving a motor vehicle. More specifically, appellant argues that "operation of any motor vehicle" includes a school district's establishment, placement, and timing of school bus stop locations. (Appellant's Brief at 28.)

{¶ 68} In support of her argument urging an expansive view of the term "operation of any motor vehicle" under R.C. 2744.02(B)(1), appellant relies on *Groves v. Dayton Pub. Schools*, 132 Ohio App.3d 566 (2d Dist.1999). In *Groves*, a disabled student confined to a wheelchair was injured when the school bus driver assisting the student disembark from the school bus failed to secure the student in her wheelchair in violation of the rules and regulations established by the school district for the proper departure by physically handicapped students. *Id.* at 567. The court of appeals held that there were material issues of fact for the jury regarding whether the operation of the wheelchair lift on which the student was injured was equivalent to the operation of a motor vehicle for purposes of R.C. 2744.02(B)(1). The facts in *Groves* are distinguishable from those in the instant case, as E.R.-R. was never on the school bus and E.R.-R.'s death resulted from her being struck by another motor vehicle prior to the time the school bus arrived at the bus stop. Moreover, *Groves* did not concern the establishment, placement or timing of the school bus stop.

{¶ 69} Appellant also relies on non-binding judicial authority from other jurisdictions. Review of these cases reveals that all are inapposite, as none involve Ohio's political subdivision immunity statutory scheme nor the establishment, placement or timing of a school bus stop location, and all are factually distinguishable from the present case.

{¶ 70} For example, appellant cites *Nolan v. Bronson*, 185 Mich. App. 163 (1990). There, a student was killed by a car after disembarking from the emergency exit at the back of the school bus. The plaintiff asserted that the school district and bus driver were liable on three bases: that the defendants negligently failed to stop the school bus in the roadway and activate its warning flashers so that the bus would be completely visible for 400 feet to vehicles approaching or overtaking the bus; that the defendants negligently failed to require the student to get off the bus from its front exit and walk across the street in front of the bus; and that the defendants' negligently failed to prevent the student from getting off the bus and crossing the street where there was no traffic light.

{¶ 71} Noting that the exception to governmental immunity under Michigan law provided that a governmental agency such as a school district is liable for bodily injury resulting from the negligent operation by any employee of a motor vehicle owned by the governmental agency, the court determined that "[t]he stopping of a school bus for the purpose of discharging passengers, and the bus driver's duties attendant to the stopping of the school bus, unquestionably constitute operation of a motor vehicle." *Id*. at 291. Having so found, the court concluded the plaintiff's claims fell within the motor vehicle exception to governmental immunity under Michigan law. *Id*. *Nolan* is both factually and legally distinguishable from the present case. Here, E.R.-R. was never on the school bus and she was killed prior to the school bus arriving at the bus stop. Further, the *Nolan* plaintiff did not raise any issue regarding establishment of the bus stop location.

{¶ 72} Another case cited by appellant is *Kentucky School Bds. Ins. Trust v. State Farm Mut. Auto. Ins. Co.*, 6th Cir. No. 92-6451 (Apr. 1, 1994). There, a public school bus driver was permitted to drive the school bus home and park it overnight near his home. In the winter months, the bus driver routinely started up the bus in the early morning, turned on the heater, then returned to his home while the bus warmed up. Several students often boarded the unattended bus. One of those students was struck and killed by a car as he was

crossing the highway to board the school bus. The school board settled the subsequent tort action filed by the student's parents. The school board trust paid the entire settlement amount and then sought reimbursement from the insurer. When the insurer refused to contribute, the school board trust filed an action against the insurer. The district court held that the insurer's policy did not cover the tort action because the student's death was not connected to the "use" of the school bus as required by the policy. The Sixth Circuit reversed, holding that the student's death arose from the "use" of the school bus and was within the scope of the school board's insurance policy with the insurer. The court reasoned that the bus loading process began when the bus driver started the bus and that the driver's practice of leaving the bus running with the heater on but unattended was the "but for" cause of the student's death. The *Kentucky* case is legally distinguishable from the instant case, as it involved the interpretation of language in an insurance contract and did not involve political subdivision immunity. Further, there was no allegation in the case related to the establishment of a school bus stop. Moreover, the facts are distinguishable, as E.R.-R. ran across the street long before the bus arrived at the bus stop.

{¶ 73} As noted by CCS, Ohio appellate courts have concluded that a school district's establishment of a bus stop location is not considered operation of a motor vehicle for purposes of the immunity exception in R.C. 2744.02(B)(1). In *Sears v. Saul*, 2d Dist. No. CA 17102 (Feb. 19, 1999), a five-year-old student was killed while attempting to cross a roadway to reach a median strip where he and his classmates ordinarily waited for the school bus. As the student walked across the roadway, he was fatally struck by another school bus. Among the allegations in the lawsuit were that the school board and its employee placed the bus stop at an inherently dangerous location and that they negligently, willfully, and recklessly continued to keep the bus stop at that location. Because the case was essentially based on the defendants' acts of officially locating, and perhaps unofficially changing the bus stop location, the court determined that the situation was too narrowly confined to fit within liability for " 'operation' of a motor vehicle" under R.C. 2744.02(B)(1).

{¶ 74} In *Glover*, a kindergarten student was required to cross a busy two-lane street in order to reach the bus stop designated by her school district; there was no traffic signal, crosswalk, or crossing guard at the intersection where the bus stop was located. After the student got off the bus, she ran in front of a car; the driver, unable to stop, struck the

student, causing injuries.  The court held that R.C. 2744.02(B)(1) was inapplicable where the case was "based on the alleged improper location of the bus stop and the negligence or recklessness of [the school district and the bus driver] in continuing to use a dangerous drop-off point."  *Id*. at *12.  The court found that the planning and implementation of bus routes did not fit within the exception to immunity for operation of any motor vehicle.  *Id*. at *19.

{¶ 75}  In *Day v. Middletown-Monroe City School Dist*., 12th Dist. No. CA99-11-186 (May 1, 2000), a high school student was transported home by a school bus at the close of the school day.  The school bus dropped the student off at the bus stop.  Between the bus stop and home, the student had to cross a set of railroad tracks.  While crossing the tracks, the student was struck by a freight train, causing her to suffer serious injuries.  The court considered whether the school board could be held liable for its decision regarding placement of the bus stop.  The court determined that the decision of the school board regarding the placement and timing of school bus stops is a discretionary function of the board, and as such, the board lost its immunity only if the judgment of its members or the person authorized to act on behalf of the board pursuant to Ohio Adm.Code 3301-83-13(A) was " 'exercised with malicious purpose, in bad faith, or in a wanton of reckless manner' " under R.C. 2744.03(A)(5).  *Id*. at *9.  The court noted that the complaint contained no averments that the decision to place the student's bus stop was made with malice, bad faith, wantonness, or the recklessness.  The court found that the board's "immunity is preserved as to this issue."  *Id*. at *10.

{¶ 76} The court also considered whether dropping the student off at the bus stop constituted negligent operation of a motor vehicle pursuant to R.C. 2744.02(B)(1).  The court stated:

> This issue was extensively addressed in *Glover v. Dayton Public Schools*, 1999 Ohio App. LEXIS 3706 (Aug. 13, 1999), Montgomery App. No. 17601, unreported, wherein the Second Appellate District held that R.C. 2744.02(B)(1) was inapplicable where the case was "based on the alleged improper location of the bus stop and the negligence or recklessness of [the school district and the bus driver] in continuing to use a dangerous drop-off point." Although "operation of any motor vehicle" may encompass more than simply driving the vehicle, the term primarily concerns the "physical discharge from the bus" of the child. * * * Within this

> definition is included those situations in which a lift ramp is used to aid children in boarding and leaving the bus, *Groves v. Dayton Public Schls.*, 132 Ohio App.3d 566, 725 N.E.2d 734 (1999), or where the school bus remains present and is still unloading other passengers. *Glover*, citing *Nolan v. Bronson* (1990), 185 Mich. App. 163, 460 N.W.2d 284.
>
> [The appellant] makes no allegation in her complaint that the bus was present when [the student] was struck by the freight train. Without such an allegation, there can be no legal basis for asserting her injuries resulted from the "operation of any motor vehicle." Neither "the planning and implementation of bus routes nor the bus driver's alleged negligence in discharging [the student] fit within the [R.C. 2744.02(B)(1)] exception to immunity for operation of any motor vehicle." *Glover*.

*Day* at *10-12.

**{¶ 77}** Appellant acknowledges the holdings in *Day* and *Glover* "that the planning and implementation of bus routes nor the bus driver's alleged negligence in discharging fit within RC 2744.02(B)(1) exception"; nonetheless, appellant contends that "these cases are not controlling law and are not as persuasive on this court as [the] contradictory holding of the Sixth Circuit as outlined above." (Appellant's Brief at 32.)

**{¶ 78}** The reasoning employed by the courts in *Day* and *Glover* applies to the present case. *Day* and *Glover* specifically address the alleged improper establishment, placement, and timing of a school bus stop location in the context of Ohio's political subdivision immunity statute, particularly the exception to immunity set forth in R.C. 2744.02(B)(1) regarding "operation of any motor vehicle." Appellant cites no contradictory Ohio authority holding that "operation" of a motor vehicle includes the establishment, placement, and timing of a school bus stop location. Further, we have already determined that the *Kentucky* case from the Sixth Circuit is inapposite.

**{¶ 79}** After reviewing the record in the light most favorable to appellant, we conclude there are no genuine issues of material fact remaining and that CCS is entitled to summary judgment as a matter of law on appellant's claim under R.C. 2744.02(B)(1). It is undisputed that the school bus was not involved in the accident and was parked at a location some distance from the bus stop at the time. Under such circumstances, there is no exception to immunity for the "operation" of a motor vehicle. Further, pursuant to Ohio

case law, establishment of a school bus stop does not constitute "operation" of a motor vehicle for purposes of R.C. 2744.02(B)(1).

{¶ 80} Because we find the R.C. 2744.02(B)(1) exception to immunity does not apply, and appellant does not rely on any of the other exceptions to immunity set forth in R.C. 2744.02(B), we need not address whether any of the defenses contained in R.C. 2744.03 apply. *Jackson* at ¶ 25; *Glover* at *10.[7]

{¶ 81} Appellant further contends that "[CCS] and the bus driver's actions are also not subject to immunity due to the exception under R.C. 2744.03(A)(6)(b)." (Appellant's Brief at 34.) As noted above, in Count 2 of her complaint, appellant alleged that under R.C. 2744.03(A)(6)(b), CCS's decision to keep the bus stop in a dangerous location was wanton and reckless. In support of her argument, appellant relies on the opinion expressed by Fennell in his report and deposition testimony regarding CCS's alleged wanton and reckless actions.

{¶ 82} R.C. 2744.03(A) provides as follows:

> (6) In addition to any immunity or defense referred to in division (A)(7) of this section and in circumstances not covered by that division or sections 3314.07 and 3746.24 of the Revised Code, the *employee* is immune from liability unless one of the following applies:
>
> * * *
>
> (b) The *employee's* acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner[.]

(Emphasis added.)

{¶ 83} By its express terms, R.C. 2744.03(A)(6)(b) applies to the acts or omissions of individual employees of a political subdivision, not the political subdivision itself. Appellant never identified the "John Doe Bus Operator" as a party, nor named any employee of CCS as a defendant. Because R.C. 2744.03(A)(6)(b) does not apply to CCS, appellant is not entitled to any recovery under Count 2 of her complaint.

---

[7] As noted above, the trial court determined that "*even if one of the exceptions to immunity under R.C. 2744.02(B) were applicable,*" CCS still had an absolute defense to immunity under R.C. 2744.03(A)(3) and (5). (Emphasis added.) (Dec. 1, 2023 Decision & Entry at 4.)

{¶ 84} For the foregoing reasons, appellant's second assignment of error is overruled.

## IV. Conclusion

{¶ 85} Having sustained appellant's first assignment of error and overruled appellant's second assignment of error, we hereby affirm in part and reverse in part the judgment of the Franklin County Court of Common Pleas and remand this matter to that court for further proceedings in accordance with law and consistent with this decision.

*Judgment affirmed in part*
*and reversed in part; cause remanded.*

MENTEL and BOGGS, JJ., concur.

_____